The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Eugene G. Doherty presiding. Good morning. The court is calling case number 4-24-0499, Regent Insurance v. City of Bloomington. I would ask both counsel to state your appearances for the record, starting with counsel for the appellant. Good morning. Matthew Policastro of Cozen O'Connor on behalf of the plaintiff appellant, Regent Insurance Company, as subordinate of Acme, Inc. Good morning. Jonathan Stump, counsel for Appalachia City of Bloomington with the law firm of Quinn Johnston. All right. Mr. Policastro, you may proceed. Good morning, Justices, and may it please the court. Again, as I mentioned, my name is Matthew Policastro. We're here today focused solely on the question of whether the circuit court erred in granting the city's motion for summary judgment on plaintiff's inverse condemnation count. The court previously dismissed the city's appeal on the negligence count, so we are only focused today on inverse condemnation. The circuit court's initial finding... Excuse me. Before you jump into your argument, I would like to briefly just address jurisdiction in this case, because with regards to that February 14, 2024, order that was signed, paragraph 4 states, the court finds that judicial economy is served by granting these requests for a 304A finding to avoid potential for duplicate trials. However, the rule requires that the court make an express finding that there is no just reason for delaying either enforcement or appeal or both. Why should this court construe the language that judicial economy is served by granting these requests for 304A findings to avoid potential duplicate trials as the same requirement under the rule? I think that the underlying facts of the negligence and the inverse condemnation count are one and the same, and I think that to have a trial on the negligence count and then to have a separate trial on the inverse condemnation count if the court were to overturn the circuit court's finding on the inverse condemnation dismissal would create a complete waste of... It would result in judicial waste and would not lead to judicial economy, Your Honor. But that's not the specific language that's required for a 304A finding. Do you agree with that? I don't disagree. And so, is there... I guess my question is generally we look at the complied with, and so I'm just asking the question, is there a reason in this case given that language used by the court and the reference to 304A that this court should still find that it is sufficient under the rule such that this court could exercise jurisdiction? I think the issues before appeal should be addressed now because they do so clearly overlap with the issues that are going to be tried on the negligence count. I do think that the court should exercise jurisdiction today and still hear this appeal given the overlapping nature of the inverse condemnation and negligence counts. So, if we took a very, very liberal interpretation of the requirements of Rule 304A, it's a little deflating to then see that there's a question certified, which isn't even a thing under Rule 304A. It just seems like this one was wheezing to try to get off the ground but didn't quite make it. How do we construe this as an intentional invocation of Rule 304A when it doesn't say the language that it's supposed to say, and then it says stuff it's irrelevant to say? I agree that the 308 language, the certified question language, was entered in error. I agree. I do think that the spirit of the court's order was intended to comply with the requirements of 304A. I think that was the court's intent, despite potentially not including all of the necessary language for this court to have jurisdiction over this appeal. Thank you. Turning to the underlying merits of the inverse condemnation claim and the court's reasoning for dismissing that inverse condemnation count, the court found initially that there was no evidence of long-term diminution in value suffered by the plaintiff as a result of the conduct against the city. The plaintiff's position is, and we believe that there is ample support in the record for this, that there was substantial evidence of diminution in value provided, showing that there was an actual pecuniary loss suffered by the AFNI property. Was that measure taken prior to the repair? The measure was taken, the fair market value analysis, the diminution in value analysis was completed after repairs were completed. So, temporally, that analysis was completed after the repairs were finished, but it was a retrospective analysis that looked at the value of the property immediately before and immediately after the damage occurred. So, while it occurred, it actually occurred by our expert appraiser after the repairs were complete. His analysis focused on the moments before and after the damage occurred. So, it is retrospective in its analysis. This is an unusual cause of action. Illinois seems to be a place where damages are required, but hasn't the Supreme Court's authority interpreted that to require damages and diminution of value that persist beyond the repair? Respectfully, I think that that's exactly what the court has said in Hampton for the purposes of a takings-prong analysis under the Takings Clause of the Illinois Constitution. I think that the Supreme Court's interpretation of the damage prong of the Takings Clause has said that the definition of damage in a condemnation action is diminution in value or actual pecuniary loss. I don't think that the damage analysis requires some long-term or permanent form of damage that would be capable of repair. I think to do that would then render the damage prong of the Takings Clause superfluous and really irrelevant because then you'd be looking at a permanent form of damage, which would ultimately, I think, be conflated or be almost identical to a taking. I think that the Constitutional Convention of 1870 made it very clear that the purpose of a damage prong was to provide for a condemnation action when property damage occurs less than a taking, and I think that's exactly what we're looking at here. I think the case law makes it clear that what constitutes damage in a condemnation analysis is specific pecuniary loss or specific diminution in value. It can't be future or speculative, but it has to be something particularized that diminishes the fair market value of the property, and I think that's exactly what we've got here. I think expert appraiser Angelo Sequeiros established that there is a specific and direct pecuniary loss arising from the challenged conduct against the city. Is there any limiting principle on that? Does that mean a city vehicle takes out someone's mailbox? That becomes a constitutional damages claim? It depends on the circumstances of how the city's vehicle damaged the mailbox. And that's the other thing. Isn't it reasonable to say that the constitutional remedy isn't a fault-based remedy at all? It's simply a remedy that says if the government damages your property and you show proximate cause to those damages, we aren't even looking at fault. I think you hit the nail on the head, Your Honor, and I think that the limiting factor that the additional element required is one of either intentionality by the city or the governmental actor or that their actions would be reasonably foreseeable that the damage claimed of is caused is caused by the challenged conduct. How is that different than a tort claim? I think that the key difference is the existence or the lack of existence of a duty. I don't think that a duty needs to be established to make out a prima facie case for a damage condemnation claim, whereas certainly it would be essential for a tort claim. I think that is the primary distinction between the two causes of action, at least with respect to a property damage claim like this. But what it tells me is if that's the correct interpretation, anytime anyone is injured by any government action or their property is injured, I should say, you'd be crazy not to make it a constitutional claim because you've just lost the need to prove fault. And it seems like that's an awfully broad interpretation of the constitutional provision. Yeah, I don't know that it's that broad. I think that there's a lot of things that happen by accident or incidentally through government conduct that could cause damage that would not create a viable damage claim. I think there is an important element to a condemnation action that requires either intentionality or foreseeability on the part of the government actor. And I think that exactly describes tort responsibility. So I guess I'm trying to understand what would be the case that would give rise to tort responsibility for property damage that wouldn't also give rise to a constitutional damage claim? I think a key example would be where a policy decision that is subject to tort immunity cannot be established as a viable tort claim. But the tort immunity itself, though, would not apply to an inverse condemnation claim. So in some respects, I think the condemnation claim is broader than a tort claim in terms of its viability. But factually, I think there could be a lot of overlap between the two. I feel like we're about to pronounce the time of death on tort claims against municipalities or government entities if it's based on property damage. We now have a constitutional remedy for any damage that you don't have to prove fault and you're not subject to tort immunity. That's a pretty potent thing if we read it quite that broadly. Yeah, I still think that there is a substantial limiting factor in proving either intentionality, which I think would be broader than a tort claim, that would be trespassed. Sure. Or some sort of foreseeable conduct that causes damage. I don't, I just don't think that those two issues perfectly overlap with one another. Okay. So turning to the other, I think, primary issue involved in this case, it really is the foreseeability of the damage at issue in relation to the city's challenged conduct. And I think what's critical here are several things. First, the testimony in the record of the AFNI employees who contacted the city of Bloomington shortly before, about a year or two before this loss occurred, to let them know that this heightened water pressure from pressure zone was causing direct damage to the fire suppression system of the AFNI building. And that's really important because the pipe at issue supplied the fire suppression system. And I think that evidence of prior harm that the city had been made aware of directly triggers that foreseeability analysis under the takings analysis. Just for clarity of a timeline, this building was built after the car plant, if you will, or the car facility, correct? So the water and the design system was already there when they elected to build. Is that correct? That's correct. This building essentially tapped into, unbeknownst to it at the time, tapped into an enterprise pressure zone. That's correct, your honor. And I think had the AFNI employees not contacted the city back in 2018, 2019, 2020 prior to this occurring, I think that that would pretty much render the inverse condemnation claim non-viable. I think that that is a critical element here is that the AFNI folks specifically told the city that this enterprise pressure zone was causing particularized harm to this property, not to it. And so the city then at that point knew that it's the design, the plan of its enterprise pressure zone as both designed and built was now causing specific harm to the AFNI property. I think that's critical to being able to establish that there is foreseeability in the city's conduct here. Because while they may have never known, had AFNI not said something, once AFNI said something, I think that increased their knowledge and that potential foreseeability of this loss. Thank you. I also wanted to briefly touch on the city's invocation of the Enbridge case. I think the Enbridge case is focused specifically on by the city in its briefing, even though it doesn't deal with inverse condemnation, because of this question of prior occurrences. And I think the critical issue in Enbridge, the issue that gets addressed at great length in the city's brief is what the prior damage was, or I'm sorry, what the prior dangerous condition was. Enbridge dealt with a leaky water pipe that was essentially damaging an oil supply line that was directly underneath the water line. So the dangerous condition in that case was the leaky pipe, the leaky water pipe. Here, it's completely different. The dangerous condition that the city had been made aware of was the heightened pressure in its enterprise pressure zone, had nothing to do with the pipe that was underground. Because this really isn't a case of the city's duty to inspect, maintain or repair the AFNI property or the AFNI pipes. It's really about the impact and the damage that the enterprise pressure zone was causing to the AFNI property. And I think that's the critical distinction that is missing in the Enbridge case, despite there being, admittedly, some factual overlap between the cases. I think that is where the comparison really ends, because the legal analysis, I think, is factually distinct from the case at present. And then finally, your honors, I wanted to briefly touch on the Montana cases that the city cites in its brief in response to our inverse condemnation claim that the city of Billings, I'm sorry, the Whitman versus city of Billings and the Hamlin construction case. I think both of those cases stand for the proposition that the public improvement has to cause damage through the deliberate design and plan of the public improvement. And I think that's what we've got here. The enterprise pressure zone was designed to provide elevated water pressure for a car manufacturing plant. The elevated water pressure is exactly what's at issue in this condemnation claim. So it's not a situation where there's a misuse or some sort of problem with the public improvement. The public improvement acted exactly as intended. It created this elevated water pressure, and that is the allegation that caused the damage at the AFNI property. So I think that even if this court adopts the Montana Supreme Court cases, I think that this case and this cause of action is consistent with and supported by those opinions and is not undercut by those Montana opinions. Thank you, your honors. Thank you, counsel. Mr. Stump. Thank you. May it please the court. Again, I'm John Stump. I'm here representing what is actually my hometown, the city of Bloomington. And our position is that the motion for summary judgment was properly granted. Before you get going on that, would you please address the question of jurisdiction, whether there was a proper 304A finding made? Well, in fairness, your honors, I did not argue that in my brief, and I did not investigate that. But what I will say is that there is a corresponding appeal that we had in our negligence denial of the motion, which was summarily dealt with by the court as finding no jurisdiction. Different issues though, because and in addition to that, and again, I'm referencing the court's ruling in that appeal. So I believe there was language in the court's ruling that indicated that even if we had asked for a 308 finding, that that would also have not been acceptable to the court. So well, no, what it said was asking the trial court is step one under rule 308. You would then need to ask the appellate court whether it agreed with the 308 finding. It's two steps, and you just went ahead and filed a notice of appeal after the trial court's order. We did. And so that was the court's finding. And with respect to this particular appeal, if there is an issue of judicial economy, I understand Mr. Policastro's position that it's much easier to try the case once than twice. And that would be one of the basis. I know that the order was actually circulated between Mr. Policastro and I that was discussed as the basis that we didn't want to have to try the case twice. In your interpretation, is that a specific application of the general principle that there would be no just reason to deny an interlocutory appeal here? I don't really take a position on that. Okay. Either way. All right, you can proceed. Thank you, Your Honor. As indicated before, that the pumping station that was created as part of this enterprise zone was not designed and built in such a way that it was reasonably foreseeable that it would cause a corroded ductile iron pipe on plaintiff's property to fail 35 years after the implementation and the construction and the operation of the pumping station. I don't think there's any real dispute as to the basis and the reasoning as to why this enterprise zone was created in the first place. The purpose was to facilitate the needs of Diamond Star Mitsubishi to come into Bloomington Normal and produce its, at the time I believe it was a Mitsubishi Mirage motor vehicle. And now, although there's been a change in ownership and a change in production, it's servicing the Rivian plant that now produces the Rivian motor vehicle, their electric vehicles. But the reasoning initially was we would want to have this large employer come in and the city created this enterprise zone. And I believe that the this pumping station would put out between 90 and 95 psi through its system. And when we, I think your honor's original question to Mr. Policastro with regards to the analysis that's undertaken when we're looking at an inverse condemnation claim for damages or for takings, the analysis is really the same as to whether the invasion of the property was either intentional or a foreseeable result of an authorized government action. The authorized government action in this case, it has been a moving target because initially the complaint alleged that in January of 2020, the city resumed service of water by rapidly turning on the gate valve and this rapid turning on released water and created a water hammer situation. Following the testimony of Kurt Bloyd, who was the person responsible for this, I think the governmental action aspect of that changed because as indicated in our brief, he testified that even Superman wasn't strong enough to turn this 42 times with a wrench and have it come into the So the operational current manifestation of what the government action was is found, I think, quite succinctly in plaintiff's brief on page eight where they're talking about their expert's opinion and they say that his opinion is that if there is a higher base water pressure, it will create a water hammer. So the basis of his opinion as to what the governmental action was in this case was the provision of the 90 to 95 PSI and as the court correctly recognized, this building was constructed in 2000 and the pipe that failed was part of that original construction. The pipe that failed, and this is also not in dispute, it's been testified to by all three of the experts, would have a failure capacity of approximately 6,200 PSI when it starts to fail and then it could go all the way up to almost 60,000 PSI before a failure of an uncorroded pipe would take place. In 2000, when AFNI is putting its building in place and putting this pipe underneath the concrete slab, I believe the testimony of Brett Lucien was they would have known that they were receiving this 90 to 95 PSI as a result of constructing it. So it is that government action that is at issue before the court. Can I ask sort of a different wrinkle on that? Always a good idea to go back to the constitutional provision that we're applying. It says that, and I'll take out the taking part, private property shall not be damaged for public use without just compensation. What was the public use? The public use was the creation of the enterprise zone in and of itself. It was an entire zone that included the Mitsubishi plant. But that didn't lead to the damages. What is the public use that led to the damages? The creation of the pumping station to serve its citizens in that area. Well, it didn't lead to damages for a while. Usually what you're talking about here is that there's some cutting of trees in order to put in some city-sponsored power line or some intentional act related to the public use that causes damages. But this doesn't seem to fit that description, that the damages serve no public use. The damages were accidental. No one wanted them. How is that property being damaged for public use? The damage in this case is the provision of the 90 to 95 PSI to the entire enterprise zone. Not until after it popped. I'm sorry? Not until after it started flowing. After it started flowing, the public use was to service Diamond Star Mitsubishi and other companies. The creation of the damage was not intentional. The creation of the damage was not foreseeable. The alleged government act was the providing of the 90 to 95 PSI, which is elevated over residential, which would normally be... The Constitution doesn't talk about the act. It talks about what's the public use that led to the damages. And I'm having a hard time understanding what that would have been. If there is no public use, there is no condemnation. Correct. So I can end my argument at that point. These are questions, Councilor, believe me. I'll ask tough ones to both of you. I'm sure that my colleagues will too, but we're trying to understand it. That is a question that I would have to ponder in greater detail, but my understanding was that this was a vote of the City Council to create the enterprise zone. The enterprise zone was to have a 90 to 95 PSI. None of that created any damages. What the plaintiff's theory is, is that the shutting it off and turning it back on created the water hammer. It doesn't feel to me like that's a public use. The turning on and the turning off of the water, the original turning off of the water in 2020 was to perform work in the area. And then it was resumed. And the point is, it was simply resumed at the same levels that it had been providing since 1986 or 1987. All at once? At one time through 42 quarter turns of a ranch that would take approximately 10 minutes to do. And so if it is the plaintiff's position that they're going to go back to their original complaint and make that argument, I don't know that it's been satisfied by the proofs and the case. I'm happy to try that case on whether or not that created the water hammer because it's a factual impossibility. It didn't happen. There's no evidence in the record that it did happen. I think what happened later was there was allegations that turned to the manor, which it was turned back on. We did not give them notice until 2 a.m. when we turned it on and did not give them the opportunity. But the physical act of resuming the water service, I don't believe any of the experts would testify that that particular action created a water hammer. It goes back to the base provision and the rapid opening and closing of check valves that created a water hammer. But again, it goes back to Ferone's testimony that base water pressure 90 to 95% is what he believes is the cause. The reason we say it's not foreseeable and it's not the result of the act is because the act is the provision of the 90 to 95 PSI to begin with. So that would be my response to the question and I'm happy to answer it in further detail if there's additional follow-up. You can proceed. Thank you, Your Honor. We have up to the point where it's 22,000 and the Apney building is being built, the type of pipe that has been put in place is a ductile iron pipe that is eventually the culprit in this case. We actually have the smoking gun in my office right now and there's a picture of it in our brief. And you can see that over the time what took place was that, and all the experts agree on this, was that there was corrosion down to the cement inner lining. And it was the reliance on the Apney building that the cement inner lining would be enough to have the pipe go through. But these aren't the issues that the judge decided the motion on, are they? These are the facts before the court and he could have found that and that's why we're asking the court to rule on that basis in addition to others. The summary judgment would have been appropriate in that regard. Turning to what the court did rely on, we saw that the court found that, again, this issue of constitutionally damaged property was not satisfied. And I would make one point on that. I saw that there is an indication that the damages were $460,000 and that was the testimony of plaintiff's expert, Sakaris, and that this was a pecuniary loss. But what the trial court and the trial court's interpretation of Barry, as I read it, was that you would need more. You would need a higher degree of damage than you would see in a tort case. You would need a damage to the property that deprived it of its market value. And the market value analysis performed by Sakaris was that the day before the loss, it was X amount of dollars. I think it was around $5.1 million. And the day after the loss, it had reduced in value to approximately $4.7 million. So that's where you're getting the $460,000 amount that is being claimed. And the trial court simply indicated that, and I recall the questions that were asked at the time, was this amount or was this diminution permanent or was it long? I think the court used long-lasting. And both Mr. Collicaster and I were asked that same question. And I think the response was that it was simply immediately before and immediately after. And getting further into the damages aspect of it, when you look at the severity of it, $460,000 sounds like a lot of money. However, it is a diminution in value of approximately 9 or 10% when you consider the original cost. The original determination of the building was $5.1 million. But there are things in takings law, such as a temporary taking, and it's compensable. So why would there have to be permanent long-term damage to be a compensable constitutional damages injury? In relation, I think the Arkansas Fishing Dams case was a three-year indication where they were releasing water from the dam every three years. And the court, the United States Supreme Court, held that this would constitute a taking. They don't have a damages clause. I mean, that's what makes it very difficult to look to out-of-state authority. Which is why we did. We looked at the Montana case. That's what makes it difficult because those cases are in states that don't have the damages provision that Illinois has. All they're talking about is a taking. Montana does have a damages. Apologies. That's why we looked at it. Review of Berry and review of Saika's case and the Hampton case, Hampton in particular, the Supreme Court indicated that it was not going to consider or not going to rule on the damages aspect and it remanded for that issue. So that is why we did take a look at Montana and we put that case before the court. I think the Montana case was more destructive of what it would take to create this long-term, more permanent nature of damage than simply what they call an inconvenience. I realize that at first blush, $460,000 doesn't seem like an inconvenience. But again, looking at it from a takings perspective, from a constitutional damage perspective, does that rise to the level that obviously more than your Honor's initial inquiry about a mailbox, do we need to get to a certain level of permanency of, as indicated in Berry, or I guess an inference from Berry would be that it has to be substantial. That's a really hard line to draw. I don't know what a lawyer would advise their client about in the future if it's, well, it has to be a substantial injury. What would be a substantial injury at my house probably wouldn't be at a factory. It is. I am not envious of your Honor's task in crafting the ruling in this case because I agree. That's why we ended up having to look at Montana. We looked at other cases. So with that, I see my time is about to expire, so I would thank the court for its time. Actually, if I may, briefly, with regards to damages, you talked about the fact and the purpose behind the creation of the enterprise zone and this being at a higher pressure to serve the car company. Given that was the initial intention and design of this, then how would you address the argument that this damage was special then to this particular building who did not require that higher pressure and could in theory damage them because of the water hammer or the higher pressure that they were receiving? How is that damage special to them or not special to them and something that would be experienced by all on that water line? If I understand your Honor's position or question correctly, why is the damage considered special to the AFNI building and why not others? Yes. Or if you disagree with that position, why do you disagree with that position? Because the purpose was to provide the 90 to 95 psi to every customer within the enterprise zone and it was not uncommon. There were no other complaints, there were no other businesses or entities that had ever complained about the 90 to 95 psi except for the AFNI building. Again, I thank the court for its time. All right, thank you. Mr. Policastro, you have time for rebuttal. Would you mind starting with the question I asked Mr. Stump? What is the public use for which this property was damaged? Absolutely, your Honor. The public use is the city's decision to create this enterprise pressure zone. I think that is at the heart of the ultimate damage in this case. The plaintiff's experts, there's no way to look at the cause of this loss without looking at it in the context of this increased pressure zone. That was an intentional decision by the city to serve a customer and really to create an environment that was conducive to bringing in new businesses into the city. Ultimately, I think that policy choice is something that the city undertook and I think that is absolutely a public use in the context of the taking provision of the Constitution. Again, the fact that the decision was made before the AFNI property was constructed in the distribution stream, I think would be critically important but for the AFNI employees letting the know in 2018 and 2019 that this increased pressure was causing particularized harm to AFNI as a result of that elevated pressure. I think that's critical. That's a long time between the public use and the damages though, isn't it? That 18 years? Sure, but the public use was continuous and ongoing that entire time. But there were no damages until. It wasn't causing any harm. It doesn't seem as though that public use caused any damages for almost two decades. It's hard to make it attendant to the public use. Sure, something may have changed in the way that the city was creating its water pressure. Mr. Stumpf says that the city's plan was to have 95 pounds of pressure at the AFNI facility. There's evidence that the pressure at the facility was upwards of 160 pounds of pressure. That is an incredible amount of pressure for any property to withstand. The city's contention has been that there was no change in the way that water pressure was provided to the Enterprise Pressure Zone. But something did in fact change. If the goal was to have 90-95 psi, there was something that almost doubled that pressure once we got to the time frame where the AFNI fire suppression system had to be taken offline and when we then ultimately had this pipe break as a result of this pressure. So I agree with you that there is a large temporal gap between when the decision was made, but I think that it's critical that the public use was ultimately the implementation of this Enterprise Pressure Zone, and that was continuous and ongoing for 30-plus years. I also just want to briefly touch on the holding in Barrie. I think that's important to distinguish the damage it claimed in Barrie versus what we're looking at here, because I think that the Circuit Court also focused a lot of attention on Barrie. The issue in Barrie was the manner in which the City replaced lead water lines to homes. And in that case, nobody suffered any actual either lead poisoning or damage, nor was there any specific pecuniary loss as a result of the changing of the lead pipes, the lead water lines. The plaintiffs in that case contended that the future value of their homes was going to be directly impacted by that decision. And the Supreme Court said that may ultimately become actionable down the road, but it's not now. You have not established some particularized or pecuniary loss in value of your home. And that was the critical issue that caused the Supreme Court to say that there was no actionable takings claim in that case. And I think there's a direct contrast between Barrie and the facts that are present here, because we've got direct actual damage to the AFNI property. And I think that's an important distinction to draw between those two cases. All right. Thank you to both counsel. Appreciate your insights today. We'll take this matter under advisement and issue a decision in due course.